Okay, let's see. Appellants, Ms. Gondaro. Good morning, Your Honors, and may it please the Court. My name is Mariah Gondaro and I am an attorney for the appellants. I would like to reserve five minutes for rebuttal. May please watch your clock. Thank you. This case is about the right to vote and ensuring all votes are counted equally. This case is not about one election, one party, or one candidate. We do not seek to overturn any election. This case is about ensuring California's election laws, regulations, and practices are uniform, safe, and secure. Appellants are not advocating for extreme measures. They are advocating for common-sense measures that ensure uniformity and that in no way would burden the state of California. The state's contention that the challenge laws and regulations were uniform and intended to expand the right to vote is a red herring. Appellants do not dispute the state's intention in ratifying universal vote-by-mail. Appellants do not challenge universal vote-by-mail. They challenge the adjudication and review of those ballots, which is not applied consistently across the counties. As a threshold matter, it is not entirely clear whether the Anderson-Burdick framework applies to appellants' vote dilution claims, but even if it does, appellants do state a claim for relief because they do allege that were not uniform across counties. The Sixth Circuit's decision in Stewart v. Blackwell is instructive. There, the Sixth Circuit applied strict scrutiny when the plaintiffs alleged that some counties in Ohio used technologies that increased the risk that one person's vote would be diluted. The Sixth Circuit... But wasn't the issue there that the plaintiffs were worried their votes would not be counted? And for you, I don't think your clients have any problem with their vote being counted. So, you're worried that some other people might be counted too, I guess. But that's really not the same as Stewart, is it? Your Honor, I would argue that that distinction is a distinction without a difference because whether the irregularities are marred by, you know, cancellation or negation, it's a distinction without a difference. And I think Bush v. Blackwell... ...has more of the right to vote that you actually get to have your vote counted. So, it would seem like there's a much bigger infringement, potentially, on the right to vote if you can't vote than some possible hypothetical dilution even when you can vote. Our position, Your Honor, is that vote dilution is the same whether an invalid vote dilutes the power of a valid vote. And I think that Bush v. Gore makes that case and they rely on cases that involve malapportionment and state re-apportionment cases where votes were weighted differently. So, even though that this case is unique in that it involves vote cancellation and negation, meaning that the invalid votes negate the power of the valid votes, our position, Your Honor... Counsel, but what are the invalid votes here? Aren't you complaining about the method of voting, not asserting that the votes are invalid? Well, both, Your Honor. Our position is that the practices are not secure. And we've also alleged, the Election Integrity Project of California has alleged that there were numerous votes that were not properly adjudicated and counted. And in some cases, ballots were counted without signatures. And that was because the procedures were not uniform and secure. Well, so your Second Amendment complaint alleges that 974 invalid ballots have been counted in California elections since 2012. Isn't that out of millions and millions of ballots? And how does that make any difference in the outcome of any election? Our position, Your Honor, is that that's not the standard whether it would make a difference in the outcome of an election. And I think Bush versus Gore is instructive there. Because in that case, they didn't even allow the recount to go forward. There was no evidence that the irregularities would have swayed the vote either way. The only thing presented to the court was that there was uneven practices before the court. And so this case is even stronger. Because we've now gone through several elections where there have been irregularities. And we're not just talking about hundreds, we're talking about thousands of irregularities that have been recounted in the Election Integrity Project of California's records. And we also have issues with the maintenance of voter rolls, which I will get to later. We have cases, I mean, there's a question, I think, of whether Bush v. Gore would even apply as outside of the very specific facts of that case. And then we have post-Bush v. Gore cases saying, even assuming it applies, we find that the standard of sufficient state standards, essentially, have been met. So can you drill down on that? Why aren't the standards that California has imposed here that apply statewide enough? Well, they're not... I wanna talk about Bush v. Gore, because Bush v. Gore does make a statement that county officials do have discretion. And the appellees make that note, too, that local officials do have discretion, they have that pursuant to law to run elections. However, when there is evidence that they are applying practices that disproportionately impact specific voters, whether it's because the votes are not going to be counted, or the counts, the votes, the election workers are going to count invalid votes, then that raises or that implicates the Equal Protection Clause. And so my argument would be  that Bush v. Gore, because the state of California has no justification for not requiring every single county to apply the same standards when verifying signatures. This case... Can I just ask, I'm a little bit confused about your idea that the problem is that different people in different counties are treated differently. So if it's a statewide election and all the votes are just counted, then everyone is diluted the same, regardless of county, right? Well, our position, Your Honor, is that that's not... This case is not just a difference between vote by mail ballots and in person ballots, because we have the county by county variations. That's what makes... So what I'm asking is, let's even assume that there are a few more, what you would call fraudulent ballots in some counties than others. If it's a statewide election and the way that the election is determined is that all of the votes statewide are counted, then everyone in the state is diluted by the fraudulent votes all the same, right? Because you're just counting the votes in the whole state. Are you focused on some other kind of election where it matters county to county? I'm just confused about your argument that things vary county to county, because I'm not quite sure why that... What kind of election you're thinking of that mattering in. What would matter, Your Honor, in any election, just like it mattered in Bush versus Gore? I mean, the court could have made that same holding there. They could have made the holding that, well, the improper procedures in counties could have affected all voters the same because it was a presidential vote across the entire state. But that's not what Bush versus Gore had. I don't think Bush versus Gore's concern was that someone in one county might be treated differently than the other. It was that the whole system they were worried was not a regular system. But your claim seems to be something about comparing counties. Yes, Your Honor. Our position would be that that is similar to Bush versus Gore, because our position is that Bush versus Gore was concerned about the uneven application of procedures across counties. But the injury wasn't that someone in one county was treated differently than the other. And I think you're claiming, I think, some sort of injury that someone in one county is being treated differently as the other. And I'm trying to understand that. Can you explain to me why it matters which county someone lives in for your claim? It matters, Your Honor, because if county officials, let's say in Los Angeles, are not properly reviewing signatures and they're counting ballots with invalid signatures or no signatures at all, then those invalid votes are going to dilute the voting power of the in person voters in that county. For what kind of election? Because if it's a statewide count, then won't they also dilute my vote up in Northern California? Yes, Your Honor. That is the argument whether it's a county election or whether it's a statewide election or a presidential election, just like what occurred in Bush versus Gore. You seem to acknowledge that Bush versus Gore did not erase county by county discretion and variation, right? It didn't say that there could not be county discretion in the administration of elections. So it seems that there's no argument that essentially 100% statewide uniformity is required in the administration of elections. So then, how do you get from some variation is permitted, right, to the point that this variation goes too far? I think, Your Honor, other courts have kind of provided that direction for us, and I wanna get to that. Specifically, Your Honor, I wanna first discuss the cases in the Ninth Circuit that are distinguishable. One, Lemons versus Bradbury. This Ninth Circuit held that organ standard for verifying signatures were specific, sufficiently uniform and specific to ensure equal treatment of voters. Specifically, though, on the record, the court had noted that all counties subjected, rejected signatures to a second level of review. There was no evidence that counties had applied different standards for determining whether to reject a signature. This case is entirely different because we have evidence that counties are applying different levels of review when reviewing signatures. For instance, we make the example of Solano County and Placer County. They use at least numerous points of comparison. They review rejected signatures at least three times, and EIPCA noted that citizens did not report incidents of election workers approving ballots that did not match the signatures on file. We've also now seen other courts across the county, across the country, like the Court of Appeals in Kansas. They recently ruled in a similar situation like this, that Kansas' statute regarding verifying signatures did not establish sufficient uniformity because there was no requirements for election workers to follow when reviewing signatures. Appellants allege that these irregularities are the result of California's state laws and regulations. The appellees will point to numerous guidelines that they have regarding election laws, but the key thing there is that they're guidelines. They don't necessarily have the full force of law because they're not requirements, and we have alleged in our complaint that the counties are applying different practices because those guidelines are not requirements. We also allege that past elections have shown that county registrars implemented varying practices regarding the maintenance of voter rolls. In the 2020 election, we documented hundreds of Nevadans voting in counties managed by Appellee County Registrars. Almost 124,000 more votes were counted in the 2020 election than registrants with voting records for that election. So unlike this court's decision and Clark v. Weber and Teddards v. Ducey, this case is different because, again, we have alleged that appellants or appellees' laws and regulations were not uniform. But even if this court were to hold that rational basis as appropriate under the Anderson verdict test, the state cannot point to any important regulatory interests in not ensuring that their laws are consistent and uniform. Again, they point to their interests in ratifying universal vote by mail, but appellants aren't challenging that. They're challenging the lack of uniformity. And there would be absolutely no burden to the state in ensuring and mandating uniformity. I want to again point out that Bush did note that the question before the court was not whether local entities in their exercise of their expertise may develop different systems. However, the appellees cannot run with that statement and say they're off the hook. What the court meant was that there are circumstances where counties can apply their own procedures. However, the court did find that unequal methods of counting votes among counties constitutes a violation of the Equal Protection Clause when those votes disproportionately impact voters in certain counties. The court also emphasized that the state in that case had the power to ensure uniformity and did not, much like this case. Courts all across the country have been applying Bush versus Gore to state authorized election systems. We saw that in Stewart versus Blackwell. We saw that in Northeast Ohio Coalition for the Homeless. We saw that in Black versus McGuffage and Common Cause versus Jones. The county attempts to distinguish Common Cause and Black because they involve statistically less reliable punch card voting machines. But that is a distinction without a difference. Whether counties use uneven manual procedures or voting machines is a distinction without a difference. For example, in 2012, in the Ohio Coalition for the Homeless, the Sixth Circuit applied Bush versus Gore to poll workers unequal treatment of ballots. There, the Ohio Consent Decree allowed certain voters to save their ballots from rejection if they could show that the poll workers caused their wrong precinct vote. This caused unequal and arbitrary counting and rejection of ballots. And then we had recently the Kansas Court of Appeals holding that Kansas' statute regarding signature verification violated or stated a claim for relief under Bush versus Gore. So, Counsel, did you want to reserve time? Yes, Your Honor, and I will reserve the remaining time for rebuttal. Thank you. All right. Um, Ms. Strong. Good morning, Your Honors. May it please the Court, Megan Strong for State Defendants Appellees, the California Secretary of State and the California Attorney General. I'll be spending my time this morning with, uh, counsel for the county of Santa Clara, though I believe that the court has already accommodated that by assigning a 10 minute timer to me, and I believe the county will use the remainder of our time. The county will be addressing issues and allegations specific to the county defendants, and I will address issues specific to the challenged laws and regulations. In this case, plaintiffs seek to reverse decades of progress at the state and local level toward expanding voter participation in California elections, particularly through statewide all mailed ballot voting. Plaintiffs seek to use this litigation to impose their preferred electoral system and requirements on the state, but their policy disagreements with the state and with local elections officials do not amount to any claim under the equal protections or due process clauses. In fact, the sweeping relief that plaintiffs seek here would make it harder for Californians to vote and to invite excessive federal entanglement in state elections. This court should affirm the district court's dismissal of the second amended complaint with prejudice. Unless the court has any specific place that would like me to start, I'll begin with the Anderson verdict framework, which this court stated clearly in Public Integrity Alliance versus Tucson that Anderson verdict is the appropriate standard of review in cases such as this challenging regulations of the right to vote. So here, the court need only consider whether or not plaintiffs have alleged any burden at all on the right to vote that's imposed by these regulations and whether or not that burden, if any, is justified by the state's interests. Here, plaintiffs claims fail as a matter of law when that framework is applied. So looking first to that burden step, plaintiffs have failed to allege any burden at all. I'll begin with the allegations that counsel focused on in her opening remarks regarding the alleged lack of uniform standards. Uh, simply put, California has uniform standards. Plaintiffs allegations instead focus on county variations, but those variations, even if true, affect all voters equally. To the extent that a counted vote impacts all voters equally. There's not, it's not the case here that any particular county is giving extra weight or less weight to any particular vote based on how it is applying the standards or based on how that person votes. Simply put, every person in the state of California has the opportunity to vote either by mail or in person, and those votes are then counted in a uniform manner under the challenge laws and regulations. Are there any elections where it's winner take all by county or something? I mean, I didn't really understand exactly what the concern is, but it seems like plaintiffs are alleging that in some counties there are more fraudulent votes. And so if there were some election where it's like you counted a county as one vote and the next county is one vote when you, when you add them all together for some sort of state office or something, maybe this could matter if county by county, but I don't, I couldn't quite figure out which types of elections might be like that. So I'm not aware, Your Honor, of any such election, and I'll note that plaintiffs don't allege in their complaint that there is any such election that would, would have that effect. The fact is the elections that plaintiffs focus on in their complaint and their allegations are statewide elections that do not have that result. And so any over counted votes, ineligible votes that should not have been counted to the extent they were, would affect all voters equally. They would not affect the voters who voted in the county where that vote was being counted any differently than any other voter at the rest of the state. My understanding of their claim is that counties that do not have uniform vote by mail that require vote in person are disadvantaged compared to counties that have vote by mail. So I would submit, Your Honor, that it's slightly different. It's that all counties have vote by mail. California's regulations... Right, it's statewide vote by mail. It's statewide, yes. And so my understanding of the complaint is that plaintiffs allege that different counties verify signatures differently of the signatures that are on those vote by mail ballots. But the fact is that the state of California has uniform regulations that all counties are able to evaluate those signatures and to verify them. The fact that plaintiffs would prefer to see a different method of verification does not establish that the existing method of verification, the existing standards, are not uniform. They are uniform. And the fact that plaintiffs would seek to see a different set of standards does not establish any burden on their right to vote. Particularly here because if there is any impact of... Plaintiffs allege at most the possibility of an increase in voter fraud under the challenge regulations. And while we can test that, even if we were to assume that there was an increased risk of voter fraud, that increased risk would impact all voters equally. So my understanding is the regulations require a certain number of points to not match in the signature before it can be rejected and require a certain amount of review. But then there's some county variation permitted within those standards. I think there was the most specific allegation I could find in the complaint was that some counties use machines, some counties don't. And the machines can be calibrated to different levels of sensitivity. But then I think even after the initial review, there is some kind of required secondary review. And then... Am I getting all of that right so far? Mostly, Your Honor. I might say it a little bit differently. Okay. And then if I understood your opposing counsel's argument correctly, is that the... What I think you're calling regulations that impose some signature verification, if she's talking about the same thing, she's saying that they're not binding. And so then the counties aren't necessarily following them. If that's the... If I'm getting the arguments, knitting them together correctly, what is your response to that? Yes, Your Honor. So speaking to the allegation by plaintiff's counsel that the regulations are not binding, that's not accurate. These regulations are binding. States are required... Every county is required to follow them. I think what counsel may be referring to is the fact that part of one of the regulations refers to a set of factors that elections officials may rely on in determining whether or not signatures match. Those are, quote-unquote, discretionary, including because not every factor necessarily will apply to every signature. But the fact is the state does present uniform factors that the county officials may consider. The state also, in the same regulation, presents another set of factors that officials are required to consider in each signature. That includes things like whether or not the signature was written in haste, whether there may be reason for the signature to have changed over time. So the contention that the state simply put out simply is not accurate. These are very clearly set out in the regulations that plaintiffs challenge, and counties are able to follow them. Speaking specifically to some of plaintiff's allegations that there may be some variation between county by county, it's important to note that this court and other courts have repeatedly recognized that some degree of county by county variation is inevitable in elections, but that on its own is not sufficient to give rise to a constitutional violation. Even in the Lemons v. Bradbury case that counsel referred to in her opening remarks and that this court should certainly look to in this case, there was evidence before the court that different counties had rejected different numbers of signatures in that case, and the court found that that was natural and uniform results can produce different results, but that on its own was not sufficient to give rise to a constitutional violation. Finally, I'd just like to make one more point about an issue that came up in the opening remarks that I think is really salient in this case, and that's the distinction between cases in which regulations that denied people the right to vote, that affirmatively made it more likely that somebody's vote would not be counted, those cases are clearly cases that plaintiffs rely on. In those cases, people were disenfranchised because their votes were not counted. Here, plaintiffs do not allege that their votes were not counted. They do not allege that any group of voters' votes are not counted. They allege only that the possibility that some votes might not be counted, that might be overcounted, and that's a clearly different case here and does not give rise to a constitutional violation. I see my time is up, so unless the court has further questions for me, I'll renew our request to affirm dismissal. Thank you, counsel. Ms. Hanna-Weir? Good morning, and may it please the court, Deputy County Counsel for the County of Santa Rosa County Council's appellees. Appellants seek to bring their policy disagreements with the state and county registrars to this court under the guise of a constitutional claim, but courts have long recognized that federal elections are primarily conducted by local governments that necessarily have discretion in how they organize election administration. Further, courts time and again have held that the Constitution is not an election fraud statute, and there are not constitutional claims arising out of garden-variety election irregularities. And this makes sense. Elections are extremely technical, heavily regulated, especially at the state level, and happen under intense pressure with short deadlines. Yes, sometimes mistakes may happen, but there are state court proceedings designed for quick adjudication to resolve concerns over processes or procedures that arise during an election, as well as state procedures for recounts and elections contests. At the end of the day, appellants are not raising constitutional claims. Instead, they have generalized policy concerns about how California and its county elections officials design and carry out elections. It is a policy disagreement about how to balance election security and integrity with ensuring access to the ballot, reducing barriers to voting, and finalizing results efficiently and effectively. Appellants would prefer a system built on an assumption that voter fraud is likely and must be ferreted out even at the cost of erecting additional barriers to exercising the right to vote, whereas California has designed a system that expands access to the ballot, increases voter participation, and focuses security measures on likely vulnerabilities. Appellants have failed to convince the California legislature of their position, but that disagreement does not give rise to a constitutional claim. Further, appellants seek sweeping relief beyond declaring much of the election system unconstitutional, including challenging universal vote-by-mail, according to their complaint, as well as an undefinable set of future laws and regulations. They further seek special masters to perform an audit of all elections since November 2020 and to essentially put California's election system into a permanent receivership moving forward. Appellants' second amended complaint fails to state a claim under the Equal Protection Clause or Due Process Clause. As counsel for the state laid out, the challenged statutes and regulations do not burden the right to vote. If anything, they exist to make it simpler and more secure for voters to exercise their right to vote. Therefore, under the Anderson verdict framework, the state's important governmental interests are more than enough to justify the challenged statutes and regulations. Appellants continually rely on Bush v. Gore. Can I ask a question about the framework? So, I think I understand your argument to be that we should apply Anderson verdict to at least some things, and I think I understand better how the equal protection aspect of this claim would fit under Anderson verdict than I do about the due process. It seems like in Sewells and Bennett, there was sort of a separate due process analysis, and I'm wondering, I know you think the due process claim fails, but do you think it's a separate analysis, or do you think it's under Anderson verdict? Thank you, Your Honor. I think the answer is both and, insofar as I think the courts have applied the Anderson verdict framework to constitutional challenges at the facial level, so a facial challenge to a statute or regulation, but I do think that in Sewells and in this case, there were also county by county or individual by individual type allegations where I think the analysis under the due process clause related to distinguishing garden variety election irregularities from something that calls into question the fundamental fairness of the election is the analysis the courts have applied. And that analysis of whether this is just a garden variety allegation or something more fundamental, that in your view is a due process analysis that's outside of Anderson verdict? I think it's consistent with Anderson verdict, but it does seem like the courts have sort of gone further than just the sort of Anderson verdict analysis to look into whether or not there are allegations that rise above the level of garden variety election irregularities, and I think that's primarily in instances like in this one where there are county by county allegations, so perhaps it's more an as-applied type challenge and analysis in that instance. Bush v. Gore was expressly limited by the Supreme Court to its facts. It has limited if any precedential value. The only cases that appear to follow it closely address the same types of issues with unreliable punch card voting technology, which is not an issue in this case, and the Supreme Court explicitly noted that Bush v. Gore did not address whether local entities in the exercise of their expertise may develop different systems for implementing elections. Second, the Ninth Circuit, in several cases, Lemons v. Bradbury, Rodriguez v. Newsom, Southwest Voter Registration Education Project v. Shelley, and Short v. Brown, has repeatedly recognized the limited precedential value of Bush v. Gore. As counsel for the state noted as well, Lemons is particularly instructive in this case, since there, the Oregon signature verification standards used were far less robust than California's signature verification standards. In that case, the direction from the Oregon statute was to compare the signature on the referendum petition to the signature on file, and if it did not match, to do a second layer of review. California's standards are similar. It's to compare the signature on the ballot to the signature on file, and if it's rejected, to subject it to at least another layer of review. What goes further than that? First, it suggests that the signature on the ballot is presumed to be that of the voter, because we have set up a system where we send the ballot to the voter, and the voter returns it, and that is a chain of custody that gives sufficient indicia of reliability that most likely the signature on the ballot is that of the voter. Second, our second layer of review for rejected signatures requires that two elections officials find beyond a reasonable doubt that the signature does not match, and additionally, as state appellants laid out in the regulations, there are both mandatory and permissive factors that signatures should be reviewed under, in that the signature should be compared by assuming that if it, for example, appears that it was written hastily, or it appears it was written on an uneven surface, that that might be a factor to consider in why it may appear potentially to not match, and then gives a list of permissive characteristics which, as the state mentioned, may not apply to all signatures. For example, not every name has an I or a T, and so the characteristics about how you dot an I or cross a T wouldn't apply to every name. But it would be an unrealistic understanding of those permissive characteristics to say that an elections official would be permitted to ignore them altogether. It's rather a recognition that not every characteristic is relevant to every signature compared to some. Appellants rely on black and common cause repeatedly in their briefing. Those were both about punch card machine technology. We would note that the common cause district court case was called into question by Southwest Voter Registration Education Project, a case from this circuit, which involved many of the same counties and essentially the same claim about the same voting technology machine. And the Ninth Circuit found that the district court did not abuse its discretion in Southwest Voter Registration Education Project by finding that they were not likely to succeed on an equal protection claim. County appellees would note that many of appellant's allegations are not well-pled because they are conclusory or speculative. And so while appellants continually rely on saying they have thousands of affidavits and thousands of allegations, the court should look carefully through its complaint to note that many of the allegations are conclusory or speculative. For example, an allegation that an observer saw a person drop off several ballots without voter signatures and those ballots were counted is speculative at best. All that observer saw was the election official take custody of the ballots. As detailed in our briefing, the processing of vote-by-mail ballots has several steps and it would be implausible for an observer to be able to track those specific ballots through the system and know they were counted. Several of the allegations of officials following the law or doing nothing wrong. For example, ballot duplication necessarily occurs after the election official has custody of the ballot and voters are not present. Appellants' repeated allegations relating to voter registration rules similarly call for the court to draw speculative inferences. Appellants do not bring a claim directly related to the National Voter Registration Act and voter registration maintenance. Instead, the allegations seek to create a general atmosphere that it is possible that inactive, dead, or otherwise ineligible voters are on the rolls and that somehow directly increases the risk of voter fraud. Further, appellants speculate and ask this court to draw the inference that every vote-by-mail ballot that's missing a signature or has a mismatched signature should not be counted and they suggest that this is because they're all fraudulent. Not true. What should have happened is those ballots would have gone to the signature process whereby voters would have an opportunity to correct the missing or mismatched signature and some of them would have and would have been lawfully counted. So it's not the case that the court can make the speculative inference that every single mismatched or missing ballot is invalid or fraudulent. And for all of those reasons, the counties would respectfully ask that the District Court's decision to dismiss this case in full without leave to amend be affirmed. Thank you, Counsel. Ms. Godero, you have some time remaining. Thank you. I want to first address that appellants are not seeking to overturn any expanded opportunities to vote. Again, this is not a policy dispute. The appellee's suggestion that the guidelines are uniform is simply inaccurate and misstates the allegations. They may have guidelines, but it doesn't address many of the core issues that we allege in our complaint, such as requiring election workers to spend a specific amount of time reviewing signatures. Because in our case, we have alleged numerous election workers spending one to four seconds looking at signature pairs. When individuals go to school to look at signatures, one to four seconds is not something that's going to instill public confidence in the election process. That is something that the state of California could easily require in its laws. Just like it could require election workers to look at specific points of comparison. If you look at the guidelines, it says may, not must. That is a simple fix that the state of California could fix. It also doesn't require election workers to use a signature verification machine. So you have some election workers using machines and some others doing manual procedures. There are many things, if you look in the complaint, excerpts of records, page 61 through 72, we specify the specific issues that are not uniform. Regarding Lemons v. Bradbury, the only thing that was alleged in that case was that there were different variations in regulations. That is it. That is entirely different here, where we are alleging that there are differences in application of procedures as a result of lack of uniformity. That is the big difference. I think you want the machine signature matching, not the manual, but you could get uniformity by saying everyone has to do it manually. Would that solve the problem? Your Honor, we are arguing that our contention would be that, at the very least, the signatures should be ran through a machine first. But how do you get to that being a constitutional requirement that every county needs a machine to verify a signature? We get to that constitutional requirement if we can show that the practices being applied right now are leading to massive irregularities, which we have demonstrated over the past several elections, where you have election workers spending, at most, four seconds looking at a signature, when they should be spending way more than four seconds looking at a signature. The contention that this case is different because it involves invalid votes being counted is immaterial, because in Bush v. Gore, there were facts that showed that some county procedures led to overvotes, not just undervotes. We also state a due process claim because the irregularities do not amount to garden variety irregularities. They're not the result of random mistake. We have alleged, over several years, thousands of irregularities, 124,000 more votes being counted when they should not have been counted. I think my time is up. Thanks. All right. Thank you, Council. Election Integrity Project California v. Weber will be submitted.
judges: WARDLAW, FRIEDLAND, SUNG